**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ELIZABETH TREADWAY, | ) | CASE NO. 1:25-CV-1744 |
| | ) | |
| Plaintiff, | ) | JUDGE DONALD C. NUGENT |
| | ) | UNITED STATES DISTRICT JUDGE |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| COMMISSIONER OF SOCIAL | ) | JENNIFER DOWDELL ARMSTRONG |
| SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

I. **INTRODUCTION**

The Commissioner of Social Security denied Plaintiff Elizabeth Treadway's application for

Supplemental Security Income (SSI). Ms. Treadway seeks judicial review of that decision pursuant

to 42 U.S.C. § 1383(c)(3). (Compl., ECF No. 1.) This matter is before me pursuant to Local Rule

72.2(b). (*See* ECF non-document entry dated August 21, 2025.)

For the reasons set forth below, I RECOMMEND that the Court AFFIRM the

Commissioner's final decision.

II. **PROCEDURAL HISTORY**

In December 2021, Ms. Treadway applied to the Social Security Administration (SSA)

seeking SSI. (Tr. 347.) [1] She initially claimed that she became disabled on December 31, 2008, but

she later amended that date to November 18, 2021. (Tr. 70, 347.) She identified 27 allegedly

disabling conditions: (1) anxiety; (2) cervicalgia; (3) chronic ankle pain bilaterally; (4) dorsalgia;

(5) fibromyalgia; (6) trochanteric bursitis bilaterally; (7) lumbar muscle pain; (8) paresthesia of

---

[1] The administrative transcript appears at ECF No. 6. I will refer to pages within the transcript by identifying the Bates number printed on the bottom right-hand corner of the page (e.g., "Tr. 36"). I will refer to other documents in the record by their CM/ECF document numbers (e.g., "ECF No. 8") and page-identification numbers (e.g., "PageID# 1783").

both hands; (9) bilateral Achilles tendonitis; (10) bilateral biceps tendonitis; (11) bilateral wrist pain; (12) pes anserine bursitis in both knees; (13) "shoulder issues"; (14) "disorder of bone and cartilage"; (15) osteoarthritis of both feet; (16) osteoarthritis of both hands; (17) peroneal tendonitis in the lower legs; (18) posterior tibial tendonitis of both legs; (19) scoliosis; (20) tendonitis of both rotator cuffs; (21) leukocytosis; (22) neutrophilia; (23) carpal tunnel syndrome; (24) learning disabilities; (25) depression; (26) sciatica pain; and (27) chronic obstructive pulmonary disease. (Tr. 407.)

The SSA denied Ms. Treadway's application initially and upon reconsideration. (Tr. 95, 96, 97, 107.) Ms. Treadway requested a hearing before an administrative law judge (ALJ). (Tr. 163.) Her counsel submitted a letter–brief in advance of the hearing. (Tr. 452–56.) The ALJ held a hearing on February 7, 2023, at which Ms. Treadway was represented by counsel. (Tr. 65–84.) Ms. Treadway testified, as did an independent vocational expert (VE). (*Id.*)

On March 27, 2023, the ALJ issued a written decision finding that Ms. Treadway is not disabled. (Tr. 109–27.) Among other findings, the ALJ concluded that Ms. Treadway had severe impairments of fibromyalgia, chronic obstructive pulmonary disease, depressive disorder, and generalized anxiety disorder. (Tr. 115.)

Despite making these findings, the ALJ noted that "[t]here is no indication in the medical record that the requisite number of tender points to justify a diagnosis of fibromyalgia was ever identified." (*Id.*) The ALJ nevertheless found fibromyalgia to be a severe impairment because "the symptoms attributed to fibromyalgia significantly limit [Ms. Treadway's] work-related capabilities." (*Id.*)

Similarly, the ALJ found COPD to be a severe impairment despite noting normal respiratory findings on examination in January, February, September, and November 2022. (Tr. 116.)

Ms. Treadway requested review of the ALJ's decision. (Tr. 286–87.) Her counsel submitted a brief identifying alleged errors in the decision. (Tr. 458–60.) On March 4, 2024, the SSA Appeals Council granted review and remanded the case to a new ALJ. (Tr. 132.) The Council found that the ALJ had not set adequately set forth a consideration of the supportability and consistency of the prior administrative medical findings and an opinion from treating provider Vicky Delaney. (Tr. 133–34.)

Ms. Treadway's counsel submitted a second brief in advance of the second hearing. (Tr. 464–68.) The new ALJ held a second hearing on August 21, 2024. (Tr. 42–64.) Ms. Treadway testified again, as did a second VE. (*Id.*)

On August 29, 2024, the ALJ issued a second decision finding that Ms. Treadway is not disabled. (Tr. 14–36.) Ms. Treadway again sought Appeals Council review, with her counsel submitting a second appellate brief. (Tr. 344–45, 472–76.)

On June 25, 2025, the Appeals Council denied review, rendering the ALJ's decision final. (Tr. 1.)

On August 21, 2025, Ms. Treadway filed her Complaint, challenging the Commissioner's final decision that she is not disabled. (ECF No. 1.) Ms. Treadway asserts the following assignments of error for review:

> **First Assignment of Error:** The ALJ's RFC finding is unsupported by substantial evidence. The ALJ failed to evaluate the medical opinions and prior administrative medical findings pursuant to the revised regulations. The ALJ relied upon improper considerations relating to noncompliance and subjective complaints to reject evidence of greater limitations.

> **Second Assignment of Error:** The ALJ erred at step two when failing to find Plaintiff had a severe physical impairment and erred when failing to adopt any physical limitations.

(Pl.'s Merit Br. at 17, 27, ECF No. 8, PageID# 1783, 1793.)

## III.   BACKGROUND

### A.   Personal, Educational, and Vocational Experience

Ms. Treadway was born in December 1983 and was 37 years old on the date of her application. (Tr. 70, 347.) She completed the tenth grade but did not graduate from high school. (Tr. 72; 408.) She has not worked since November 2021. (*Id.*) She does not have a driver's license. (Tr. 71–72.) She lives with her eight-year-old son. (Tr. 47.) She has remote and brief work history as a cook and deli worker, and as a cleaning worker. (*See* Tr. 397.)

### B.   School Records

The record contains school records documenting that Ms. Treadway completed the tenth grade with special education and an individualized education program. (Tr. 377–96.)

### C.   Function Reports

Ms. Treadway completed a function report on December 16, 2021, in connection with her disability application. (Tr. 415–22.) She wrote that, on a normal day, she will wake up and get her son ready for school. (Tr. 416.) She will walk him to the bus stop. (Tr. 418.) She will then come home, try to clean the house as best as she can, and then take a nap. (Tr. 416.) She will pick her son from the bus stop after school, bring him home, and then make dinner before going to bed, although her hands "freeze up" making dinner. (*Id.*; *see also* Tr. 418.) She cooks complete meals every day, and cooking takes her two or more hours. (Tr. 417.)

She takes care of her son, doing "everything a mother should." (Tr. 416.) She has no problem seeing to her own personal care, and she does not need reminders to see her to personal needs and grooming. (*Id.*) She folds clothes, sweeps, mops, and mows the lawn. (Tr. 417.) But her

4

hands "freeze up"; as a result, these chores take hours and cause pain in her hands, back, arms, and legs. (*Id.*) She needs three hours to mow the lawn because of her COPD. (*Id.*) She often cannot move the following day after doing chores. (*Id.*) Ms. Treadway described that pain in her "whole body" makes it difficult to sleep. (Tr. 416.)

Ms. Treadway wrote that she "never got" her driver's license. (Tr. 418.) She walks or obtains rides when she goes out. (*Id.*) She shops in stores for food around twice monthly, and it takes her around two hours to shop by using the "riding cart" in the store. (*Id.*)

Ms. Treadway is able to pay bills, count change, and handle a savings account. (*Id.*)

Ms. Treadway enjoys reading and reads every night. (Tr. 419.) She used to crochet, but she cannot do so any longer because her hands "freeze up." (*Id.*) She talks to people on the phone every day. (*Id.*)

Ms. Treadway estimated that she can walk for 20 minutes at a time before needing to rest for 15 minutes. (Tr. 420.) She can pay attention for 10 minutes at a time, but she "drift[s] in and out." (*Id.*) She does not follow written instructions well, but she gets along well with authority figures and follows spoken instructions "fair[ly]" well. (*See id.*) She does not handle stress well, but her ability to handle changes in routine is "fair." (Tr. 421.) She uses a cane when her legs hurt, but the cane was not prescribed. (*Id.*)

### D.      **Relevant Hearing Testimony**
#### 1.      *Ms. Treadway's Testimony*

At the first hearing, Ms. Treadway testified that she is only able to wash three or four dishes at a time due to trouble with her hands. (Tr. 73–74.) She has pain in her legs, shoulders, hips, and "everything," and her legs have "go[ne] out on [her]" when she walks, causing her to fall. (*Id.*) She uses a cane, although the cane was not prescribed. (Tr. 74.) Ms. Treadway testified that

"[n]othing helps" with the pain; indeed, things like ice and stretching make the pain worse. (*See* Tr. 74–75.)

Ms. Treadway has "COPD fits" of coughing, and sometimes she finds that she is unable to "do anything for a few days." (Tr. 75.) She is able to run the vacuum and do laundry, but doing so hurts her arms and shoulders. (*Id.*) She is able to cook, but she sometimes asks for help moving heavy cookware. (*See id.*) Ms. Treadway uses two inhalers for her COPD, and she uses a nebulizer every four to six hours. (Tr. 78.) Her COPD is triggered by "certain smells" or "bending over" or "just walking too much." (*Id.*)

Ms. Treadway testified that she is scared to leave her home. (Tr. 74.) Her depression causes her to stay at home "all day, every day." (*Id.*) She has "major" anxiety. (Tr. 75–76.) She usually only leaves her home for appointments, to go to the grocery store, or to take her son to the bus stop. (*Id.*) She sometimes finds that she has to sit down, or leave the store altogether, due to anxiety while shopping. (Tr. 76.)

Ms. Treadway said that she experiences anxiety and panic attacks "[p]retty much all day long," with symptoms including feeling dizzy and having pain in her chest. (*Id.*) She will lay down, try to sleep, and listen to music to take her mind off of the situation. (Tr. 76–77.) She has trouble in doctors' waiting rooms, and she will play a game on her phone or "disappear into the bathroom" or go outside to help deal with the situation. (Tr. 77.) She has crying spells a few times a month. (Tr. 77–78.)

At the second hearing, Ms. Treadway said that she is "very forgetful" and described having anxiety that grows "so high to where [she] pass[es] out." (Tr. 48.) She passes out from anxiety at least once a week. (Tr. 49.) She has never been injured from losing consciousness, and she does not pass out at home. (*Id.*) If she feels herself getting dizzy, she will sit down and breathe. (*Id.*)

6

Ms. Treadway was in special education classes in school for a learning disability, but she has found that her forgetfulness has gotten worse since her father recently passed away. (Tr. 51.) She has post-traumatic stress disorder related to his passing. (*Id.*)

Ms. Treadway is responsible for seeing to the needs of her household, including her young son. (*Id.*) She walks when she needs to go out, or she gets rides from fellow members of The American Legion. (*Id.*) Her son is very active with Cub Scouts, and Ms. Treadway will take him to dinners with the club. (Tr. 50.) Ms. Treadway is able to cook, clean, and "maintain the home." (Tr. 53.)

Ms. Treadway has COPD and trouble with her breathing. (Tr. 49.) She has cut back smoking from three packs a day to five cigarettes a day, with the intention to quit entirely. (Tr. 50.) She uses medical marijuana daily to help with sleep and anxiety. (Tr. 52.) Ms. Treadway was recently started on cariprazine, which has helped some of her symptoms. (Tr. 53.) She said her providers will not prescribe medication for her anxiety. (*Id.*)

Ms. Treadway watches television, listens to music, and makes homemade candles. (*Id.*)

Ms. Treadway described that she grows sore from walking up a flight of steps, and she has to take frequent five- to ten-minute breaks when cleaning. (Tr. 54.) She can work for about 20 minutes before needing to take a break. (Tr. 55.)

Ms. Treadway testified that her breathing difficulties are due to both anxiety and COPD. (Tr. 55.) She will have panic attacks, often in the middle of the night. (*Id.*) Her mind races, which makes it difficult to sleep. (*Id.*) She finds herself feeling paranoid, believing that others are talking about her and judging her. (*Id.*) She has a hard time being around other people, including at her son's school events. (Tr. 56.) She has a short temper and is "not a sociable person." (*See id.*)

Ms. Treadway stated that she had "really bad carpal tunnel" in her hands and finds that her hands "freeze up," causing her to drop things. (Tr. 62.) She does not want surgery. (*Id.*)

### 2.      *Vocational Experts' Testimony*

Don Wang testified as a vocational expert ("VE") at the first hearing. (Tr. 79.) The ALJ asked the VE to assume that a hypothetical person with Ms. Treadway's age, education, and work experience was limited to work at the light exertional level with several additional limitations. (Tr. 79.) Specifically, the person could occasionally climb ramps and stairs but could not climb ladders, ropes, or scaffolds. (*Id.*) They could occasionally stoop, kneel, crouch, and crawl. (*Id.*) They must avoid concentrated exposure to environmental irritants like fumes, odors, dust, and gas. (*Id.*) They must avoid hazardous machinery and unprotected heights. (*Id.*) Their work must be limited to simple, routine, and repetitive tasks performed in a work environment free of fast-paced production requirements and involving only simple, work-related decisions with few—if any—workplace changes. (Tr. 79–80.) They can have only occasional interaction with the public and occasional interaction with coworkers, with no tandem tasks. (Tr. 80.) The VE testified that such a person could perform the work of a mail clerk (DOT 209.687-026), garment sorter (DOT 222.687-014), or routing clerk (DOT 222.687-022). (Tr. 80.)

The ALJ next asked the VE to further limit the hypothetical person to the sedentary exertional level. (*Id.*) The VE testified that such a person could perform the work of a document preparer (DOT 249.587-018), addresser (DOT 209.587-010), or tube operator (DOT 239.687-014). (Tr. 80–81.)

Finally, the ALJ asked the VE to assume that the hypothetical person could not sustain work activity for a full eight-hour workday, would be off task for 20 percent of the day, and would

be absent at least two days per month due to their impairments. (Tr. 81.) The VE confirmed that these limitations would preclude all full-time competitive employment. (*Id.*)

Ms. Treadway's counsel asked the VE to assume that the hypothetical person from the ALJ's first two hypotheticals would additionally need to work in isolation. (Tr. 82.) The VE testified that no competitive work would be available to someone so limited. (*Id.*)

Kathleen Byrnes testified as a VE at the second hearing. (Tr. 57.) The ALJ asked the VE to imagine a hypothetical person who cannot climb ladders, ropes, or scaffolds, and who cannot work around hazards like unprotected heights or in proximity to exposed moving mechanical parts. (Tr. 58.) The person further cannot engage in occupational driving. (*Id.*) But the person can perform simple tasks without a production rate pace (like assembly line work) or strict production quotas. (*Id.*) She can interact occasionally with others and deal with occasional changes in a routine work setting. (*Id.*) The ALJ asked if there would be work available at the medium exertional level for such a person. (*Id.*) The VE testified that such a person could perform the work of a hand packager (DOT 920.587-018), kitchen helper (DOT 318.687-010), or automobile detailer (DOT 915.687-034). (Tr. 59–60.)

The ALJ next asked the VE to limit the person to the light exertional level, and to limit the person to only occasional and not concentrated exposure to temperature extremes, humidity, and atmospheric conditions. (Tr. 60.) The VE testified that such a person could perform the work of a merchandise marker (DOT 209.587-034), routing clerk (DOT 222.687-022), or small product assembler (DOT 706.684-022). (*Id.*)

The VE confirmed that there would be no work available to a person who is off task for 15 percent of the workday or who is absent for two days per month on a consistent basis. (Tr. 60–61.) In response to questions from Ms. Treadway's counsel, the VE testified that additional breaks

9

(beyond normal restroom breaks) are not tolerated in the workplace. (Tr. 61–62.) The VE further testified that no competitive employment would be available to a person limited to working in isolation

### E.  State Agency Consultants

A disability examiner (Tracy Spencer), a physician (Elizabeth Das, M.D.), and a psychologist (Courtney Zeune, Psy.D.) reviewed Ms. Treadway's claim at the initial review level. (Tr. 85–96.)

Dr. Das found fibromyalgia to be a severe medically determinable impairment. (Tr. 88.) Dr. Das noted that Ms. Treadway had complained of "pain throughout her body and fatigue" and that the medical record evidence showed that "she has chronic pain syndrome/fibromyalgia with 18/18 fibro tender points." (Tr. 89.) But Dr. Das noted that her x-ray imaging was normal and that she walks independently, sometimes with an antalgic gait and sometimes with a normal gait. (*Id.*) Dr. Das opined that Ms. Treadway has certain postural limitations, in that she can only occasionally climb ramps and stairs, stoop, kneel, crouch, and crawl. (Tr. 91.) She must never climb ladders, ropes, or scaffolds. (*Id.*) Dr. Das found that Ms. Treadway can occasionally lift up to 20 pounds and frequently lift up to 10 pounds. (*Id.*) She can stand or walk for six hours in an eight-hour workday and sit for six hours. (*Id.*)

Dr. Zeune opined that Ms. Treadway had a moderate limitation in her ability to understand and remember detailed instructions, but she remained able to follow simple, routine instructions. (Tr. 92.) Dr. Zeune found Ms. Treadway able to sustain routine tasks in a setting where there are no strict production demands. (Tr. 93.) Dr. Zeune opined that Ms. Treadway had a marked limitation in her ability to interact appropriately with the general public and limited Ms. Treadway to "work in a non-public setting" and to superficial interaction with supervisors and coworkers. (*Id.*) Ms. Treadway was further limited to "work in a setting where duties are relatively static." (Tr.

10

94.) Based on these opinions, the consultants concluded that Ms. Treadway could perform the work of a "bakery worker, conveyer line" (DOT 524.687-022), "electronics worker" (DOT 726.687-010), or "surveillance-system monitor" (DOT 379.367-010) and was not disabled. (Tr. 94–95.)

In a letter to Ms. Treadway explaining this decision, the Agency wrote that the evidence showed that she was treated for chronic pain syndrome but "continue[d] to have good strength and c[ould] walk normally" such that she remained able to perform work that does not involve heavy lifting. (Tr. 148.)

A disability examiner (Efrain Perez), physician (W. Scott Bolz, M.D.), and psychologist (Robyn Murry-Hoffman, Psy.D.) reviewed Ms. Treadway's claim at the reconsideration level. (Tr. 97–108.) Drs. Bolz and Murry-Hoffman found that the initial-level findings were supported by the overall evidence. (Tr. 101, 104, 106.) The consultants therefore affirmed that Ms. Treadway was not disabled. (Tr. 107.)

In a letter to Ms. Treadway explaining this decision, the Agency wrote that she "ha[d] chronic pain syndrome and fibromyalgia" but had "normal strength and sensation of [her] arms and back," could walk without an assistive device, could lift up to 20 pounds occasionally and 10 pounds frequently, could sit or stand for six hours at a time, and could use her hands without any limitations. (Tr. 159.)

### F.    **Relevant Medical Evidence**

Ms. Treadway was evaluated by rheumatologist David Stainbrook, D.O., on August 2, 2021. (Tr. 659.) She complained of a constant aching pain "everywhere" and rated the pain as a 10 out of 10 (severe pain). (*Id.*) On examination, there was tenderness noted in the shoulders, upper arms, wrists, hands, hips, legs, knees, ankles, Achilles tendons, feet, and in the cervical, thoracic, and lumbar areas of the back. (Tr. 660–61.) Dr. Stainbrook noted, "18/18 fibro tender points." (Tr. 661.) There was decreased range of motion in the shoulders, wrists, hands, cervical and lumbar

11

back, hips, knees, ankles, and feet. (Tr. 660–61.) There was decreased strength and sensation in the hands. (Tr. 660.) There was decreased grip strength and motor weakness in both hands. (Tr. 661.)

Ms. Treadway reported allergies to aspirin, naproxen, diclofenac, and duloxetine. (Tr. 663.) She said that gabapentin had not been effective. (*Id.*) Ms. Treadway was advised that "generalized stretching and aerobic exercise" would be the "cornerstone" of treatment; she was advised to engage in physical and occupational therapy and keep an "ideal body [weight]." (*Id.*) But Dr. Stainbrook noted that coexisting health problems and comorbidities would make treatment "very difficult." (Tr. 659.)

Ms. Treadway consulted with Pradyumna Kumar Padival, M.D., on September 20, 2021, to establish care. (Tr. 483.) Ms. Treadway complained of "general" body pain and pain in her chest and shoulder. (*Id.*) Dr. Padival noted that Ms. Treadway had been examined by Dr. Stainbrook, leading to "numerous diagnos[e]s" and a "questionable history of fibromyalgia." (*Id.*) Dr. Padival diagnosed her with psychogenic body system pain and prescribed lorazepam. (Tr. 484.) Ms. Treadway also complained of chest tightness at this appointment, and she told Dr. Padival that had been told she has COPD "for some time." (Tr. 485.)

Ms. Treadway followed up with A. Raj Swain, M.D., a pain specialist, on October 18, 2021. (Tr. 501.) Ms. Treadway complained of aching and stabbing pain that is "worst all the time," "increased with nothing and . . . relieved by nothing." (*Id.*) She said that she had tried pain medication, ice, and a heating pad. (*Id.*) She said she did not want to consider injections because she does not want "anything injected into [her] body." (*Id.*)

On examination, Ms. Treadway had "moderate difficulty transitioning from sitting to standing." (Tr. 504.) She had an antalgic gait and had increased pain with simultaneous knee and

12

hip extension. (*Id.*) There was increased pain with lumbar rotation and extension, and lumbar facet loading produced pain on the left and right sides. (*Id.*) A FABER test produced low back pain bilaterally. (*Id.*) There was minimal tenderness over the bilateral sacroiliac region. (*Id.*) But there was full muscle strength in the arms and legs, and a straight leg raise was negative for leg pain bilaterally. (Tr. 504–05.)

Dr. Swain ordered physical therapy for the low back and neck. (Tr. 506.) He wrote that he would not recommend opioid medication but that Ms. Treadway may benefit from medical marijuana. (*Id.*)

Ms. Treadway sought to establish care with Vicky Delany, N.P., on November 8, 2021. (Tr. 489.) Ms. Treadway complained of pain in the wrists, shoulders, and extremities. (Tr. 490.) Ms. Delany prescribed Lexapro, a Ventolin inhaler, Flexeril, and amitriptyline. (*Id.*)

Ms. Treadway met with Erica Clinker, a pain specialist and certified nurse practitioner, on November 16, 2021. (Tr. 494.) Ms. Clinker noted that Ms. Treadway had been scheduled for lumbar facet blocks, but the injections were cancelled "due to the patient's allergy to Lidocaine." (*Id.*) On examination, Ms. Treadway was breathing normally. (Tr. 496.) Her musculoskeletal examination findings were unchanged from Dr. Swain's October 2021 observations. (Tr. 497.)

Ms. Clinker recommended Cymbalta, and Ms. Treadway said she was allergic to the medication. (*Id.*) Ms. Clinker recommended gabapentin, and Ms. Treadway said she was allergic to that medication as well. (*Id.*) Ms. Treadway said the only medications that help her are Norco and Valium, but Ms. Clinker explained that "opioid therapy and benzodiazepines are not warranted at this time." (*Id.*) Ms. Clinker recommended that Ms. Treadway follow up with medical marijuana and return for injections as needed, but Ms. Clinker otherwise wrote that she did not feel that Ms. Treadway would benefit from further pain clinic therapy at this time. (Tr. 498.)

13

Ms. Treadway presented to the emergency room on November 20, 2021. (Tr. 749.) She said she had experienced a sore throat and cough for one day, denied that she had used any over-the-counter medication at home to treat the symptoms, and requested cough medicine with codeine. (Tr. 750.) She did not complain of musculoskeletal pain. (*Id.*) On examination, Ms. Treadway had "some bilateral expiratory wheezes." (Tr. 754.) Her musculoskeletal examination was normal. (*Id.*) Ms. Treadway was discharged with cough medicine and a tapered steroid for what the doctor "believe[d]" was "simply a COPD exacerbation." (Tr. 755.)

Ms. Treadway reported a skin rash on December 1, 2021. (Tr. 491–92.)

On December 6, 2021, Ms. Treadway treated with an otolaryngologist, complaining of pain in her sinuses, pain and pressure in her ear, and throat pain. (Tr. 737.) She did not complain of any musculoskeletal symptoms, and her pulmonary effort was normal on examination. (Tr. 738.) She was prescribed a nasal spray, an antihistamine, and cetirizine. (Tr. 739.)

Ms. Treadway saw Ms. Delany on January 4, 2022, complaining of COVID symptoms and no musculoskeletal symptoms. (Tr. 910–11.) On examination, Ms. Treadway's chest examination was normal; there was no wheezing, rhonchi, rales, or other abnormalities noted. (Tr. 911–12.) She had normal gait and normal bilateral upper and lower extremities with full strength. (Tr. 912.) Ms. Treadway was prescribed a nebulizer treatment. (*Id.*)

Ms. Treadway sought to refill a Valium prescription on January 10, 2022. (Tr. 919.)

Ms. Treadway went to the emergency room on January 30, 2022, complaining of cough, congestion, and a runny nose. (Tr. 703.) She did not complain of any musculoskeletal symptoms. (Tr. 704.) Her congestion and rhonchi were confirmed on examination, and imaging of the chest revealed several enlarged mediastinal nodes and a mild amount of pericardial fluid. (Tr. 708–09.) The provider attributed the fluid to likely smoking and atypical bacteria. (Tr. 709.) She wrote that

14

this was likely "an exacerbation of her COPD." (Tr. 709.) Ms. Treadway had requested cough medicine with codeine, but the provider did not "feel that is necessary" at this time. (*Id.*)

Ms. Treadway sought to refill a Valium prescription on February 28, 2022, and she was prescribed an SSRI antidepressant. (Tr. 928.)

On March 17, 2022, agency consultant Carolyn Arnold, Psy.D., completed a virtual mental disability evaluation. (Tr. 678.) Ms. Treadway reported that she had been diagnosed with depression and anxiety while a teenager. (Tr. 680.) She said she had pain "in her entire body," as well as "many other medical issues." (Tr. 682.) She described that she feels overwhelmed by her medical symptoms, "frozen and like she is trapped." (Tr. 680.) Dr. Arnold opined that Ms. Treadway's prognosis was good and could be improved with counseling. (Tr. 682.) Dr. Arnold wrote that Ms. Treadway could understand, remember, and carry out instructions and follow a conversation; she was able to sustain concentration and show persistence with simple tasks for a moderate period of time and multistep tasks for a short period of time. (Tr. 683.)

On March 21, 2022, Ms. Delany completed physical and mental residual functional capacity questionnaires. (Tr. 684–86.) She listed Ms. Treadway's diagnosis as "severe anxiety" and opined that Ms. Treadway could never lift or carry any weight, would continuously be affected by pain and other symptoms, and would be absent for four or more days per month. (*Id.*) Ms. Delany marked that Ms. Treadway has "marked" or "extreme" functional limitations and wrote that Ms. Treadway had "severe anxiety and limited social skills." (Tr. 686.) She has "repeated episodes of sudden feelings of intense anxiety" or fear or terror. (*Id.*)

Ms. Treadway consulted with Ms. Delany on March 30, 2022, for a cough. (Tr. 929.) Her respiratory examination was normal. (Tr. 931.) Ms. Delany prescribed an antibiotic. (*Id.*)

15

Ms. Treadway was in the emergency room with a cough and other viral symptoms on April 15, 2022. (Tr. 778.) There was no musculoskeletal tenderness on examination, with normal range of motion. (Tr. 781.) But the provider wrote that she had "diffuse body aches and pains" likely related to "chronic arthritic conditions." (Tr. 783.)

Ms. Treadway returned to the emergency room on May 2, 2022, concerned that she had been exposed to carbon monoxide. (Tr. 813.) She had been doing laundry when something hit her gas stove. (*Id.*) She also requested a refill of her anti-anxiety medication, saying that she had run out. (Tr. 813.)

On June 8, 2022, Ms. Delany signed a letter for "verification of disability" and wrote that Ms. Treadway was "unable to work sue to her severe anxiety and limited social skills." (Tr. 689.)

Ms. Treadway treated with Ms. Delany on July 13, 2022, for anxiety. (Tr. 935.)

Ms. Treadway went to the emergency room with an insect bite on August 16, 2022. (Tr. 832.) She went back to the ER with hypertension and pain over the last week on September 7, 2022. (Tr. 851) She said that it had been hard for her to see Ms. Delany recently, and that Ms. Delany had decreased her lorazepam prescription. (*Id.*) Her physical examination was largely normal, with no tenderness noted on musculoskeletal exam. (Tr. 854.) She improved and rested in the hospital and was discharged. (Tr. 856.) She asked about sleep aids, but the provider told her she would have to follow up with her primary care physician. (*Id.*)

Ms. Treadway saw Ms. Delany for a prescription refill appointment on September 21, 2022. (Tr. 942.) Ms. Treadway returned on November 4, 2022, complaining of weight loss, congestion, urinary tract infection, insomnia, hip and back pain, COPD, and anxiety. (Tr. 946.) She returned on November 15, 2022, complaining of COVID symptoms and insomnia. (Tr. 949.) She returned with a cough on November 25, 2022. (Tr. 952.)

16

Ms. Treadway went to the emergency room on December 7, 2022, complaining of unexplained weight loss, abdominal pain, and generalized headache. (Tr. 882.) She was determined not to have an infection, and imaging of her abdomen showed no acute abnormality. (Tr. 887.)

Ms. Treadway saw Ms. Delany on December 8, 2022, complaining of COVID symptoms. (Tr. 956.)

Ms. Treadway returned to the emergency department on December 13, 2022, complaining of cough, congestion, dizziness, headache, and shortness of breath for the last two days. (Tr. 1040.) On examination, her pulmonary examination was normal, and her other systems were normal except for abdominal tenderness and tenderness in the area of the kidneys. (Tr. 1043.) She ambulated without difficulty. (Tr. 1045.) She was found to be positive for influenza A. (Tr. 1045.)

At a medication check appointment on December 26, 2022, Ms. Delany assessed that Ms. Treadway had opioid dependence, uncomplicated. (Tr. 970.) She was continued on lorazepam. (*Id.*)

Ms. Treadway returned on January 16, 2023, complaining of cough and congestion and requesting a refill of the lorazepam. (Tr. 972.) Her pulmonary functioning was normal on examination. (Tr. 974.) Her lorazepam was refilled, but before she picked up her prescription she went to the emergency room complaining of high blood pressure. (Tr. 1070.) She said was under "a lot of stress." (*Id.*) On chest imaging, the radiologist noted "background reactive airways/bronchitis suspected without overt pneumonia." (Tr. 1074.) The ER provider wrote that the scan showed "her known COPD" but was "otherwise unremarkable." (*Id.*)

Ms. Treadway consulted with David S. Fitch, D.O., on March 16, 2023, complaining of low back pain since 2001 that has been gradually worsening since 2018. (Tr. 1475.) On examination, she had difficulty with heel/toe walking due to pain. (*Id.*) X-ray imaging revealed

17

mild disc thinning at the L5–S1 level. (*Id.*) She said she planned to follow up with Dr. Stainbrook, and Dr. Fitch made referrals to pain management "for chronic pain and fibromyalgia." (*Id.*)

Ms. Treadway went to the emergency room on March 29, 2023, complaining of hypertension. (Tr. 1104.) She said she had a headache, but that headaches are common with her anxiety and hypertension. (*Id.*) She reported continued congestion for several weeks. (Tr. 1104.) She said that her primary care physician had discontinued lorazepam in January "because her drug screen was negative." (*Id.*) Her symptoms improved upon taking lorazepam, and she was referred back to her primary care physician. (Tr. 1114.)

Ms. Treadway returned to the ER on July 2, 2023. (Tr. 1453.) She complained of a headache, which she said was common when she has high blood pressure. (*Id.*) Her symptoms improved after an administrative of lorazepam and ibuprofen. (Tr. 1462–63.) She said her symptoms were likely a "stress reaction." (*Id.*)

She returned to the ER on July 8, 2023, complaining of chest pain and hypertension. (Tr. 1147.) An x-ray revealed "possible small bilateral pleural effusions with otherwise clear lungs." (Tr. 1152.) She was discharged with antibiotics and a steroid. (Tr. 1155.)

Ms. Treadway underwent a psychiatric assessment on July 18, 2023, with Jennifer Schroeder, CNP. (Tr. 1680.) Ms. Treadway said she had lost a lot of weight this year due to anxiety. (Tr. 1681.) She had stopped taking her prescribed escitalopram because it made her feel worse, and she said she was not currently taking medication for her symptoms. (*Id.*)

She described that she felt tired and depressed, but she enjoyed being a mother and making wax melts and candles. (Tr. 1681.) She said she had daily panic attacks but can go into the public without fear; she is able to complete tasks but has difficulty with sleep, irritability, and fatigue. (*Id.*) She said that she did not want psychotherapy because "they make [her] feel uncomfortable."

(*Id.*) She reported past abuse and trauma that cause her to have nightmares and flashbacks. (Tr. 1682.) A physical examination was normal, with Ms. Treadway showing active range of motion in the extremities and with no gait abnormalities noted. (Tr. 1685.) Ms. Treadway displayed an anxious affect and described her mood as tired and depressed, but her mental status examination was otherwise normal. (Tr. 1686.)

Ms. Treadway "repeatedly asked and stated only Valium has worked to control her symptoms," but Ms. Schroeder declined to prescribe benzodiazepines. (Tr. 1686.) Ms. Treadway was started on mirtazapine. (*Id.*)

Ms. Treadway went back to the ER on July 21, 2023, complaining of worry after she accidentally inhaled essential oils. (Tr. 1439.) She said she was "out of her anxiety medicines and is waiting to see her physician again about this." (*Id.*) On examination, her mood was anxious, and her speech was rapid and pressured. (Tr. 1447.) She was given a dose of lorazepam to help with anxiety and discharged. (Tr. 1449.)

Ms. Treadway underwent psychotropic genetic testing on July 24, 2023. (Tr. 1660–74.)

Ms. Treadway went to the ER on July 26, 2023, stating that she had been stung by a bee and worried about losing consciousness, as that had happened to her previously. (Tr. 1206.) She stated that she was feeling stressed out and anxious and requested a dose of lorazepam before discharge. (*Id.*) On examination, there was no identifiable area of sting but there was a diffuse area of redness. (Tr. 1210.) She was given lorazepam and instructed to follow up with her primary care provider. (Tr. 1212.)

Ms. Treadway returned to Ms. Schroeder on September 1, 2023, reporting that she stopped using the mirtazapine because it made her too tired. (Tr. 1653.) She stated that "she really would like to have Valium prescribed as this is what helps her." (*Id.*) She described her anxiety as "over

the charts" and said she has panic attacks daily. (*Id.*) Ms. Schroeder declined to prescribe Valium and opted instead for venlafaxine. (Tr. 1657.)

Ms. Treadway returned to the emergency department on September 7, 2023, complaining of headache, chest congestion, and sinus congestion. (Tr. 1419.) On examination, wheezing was noted. (Tr. 1427.) A chest x-ray showed no acute findings. (Tr. 1429.) Ms. Treadway was discharged with instructions to continue taking her antibiotic and to add a steroid pack and an expectorant. (*Id.*) She asked for a dose of lorazepam prior to discharge to help with her anxiety, but the provider gave her a dose of an antihistamine. (*Id.*)

Ms. Treadway was in the ER again on September 22, 2023, complaining of flank and abdominal pain beginning overnight. (Tr. 1228.) A CT of the abdomen revealed no acute pathology. (Tr. 1233.) She was discharged and saw Ms. Delany the same day. (Tr. 976.) She complained that Ms. Schroeder did not take the mirtazapine that had been prescribed because "she knew she was allergic." (*Id.*) Ms. Treadway said that her mental health had "not been good lately" and that she had recently been diagnosed with post-traumatic stress disorder. (*Id.*) She was restarted on escitalopram. (Tr. 979.)

Ms. Treadway returned to the ER on September 26, 2023 (Tr. 1405.) She said that she had felt congested with a couple months, with no improvement from antibiotics or steroids. (*Id.*) She said her anxiety had been "very high" recently. (*Id.*) Her examination was notable for sinus congestion. (Tr. 1413.) She was prescribed a new antihistamine and told to follow up with an otolaryngologist. (Tr. 1414.)

Ms. Treadway returned to Ms. Schroeder on September 29, 2023. (Tr. 1626.) She said that she had not started on the venlafaxine because she was afraid to try it for the first time alone. (*Id.*) She said that Valium improves her mood "and makes her feel like her old self." (*Id.*) She described

20

having panic attacks frequently and said her anxious feelings were hard to control. (*Id.*) Ms. Schroeder reiterated that she would not prescribe Valium and stressed the need to begin taking the venlafaxine. (Tr. 1630.)

On October 11, 2023, Ms. Treadway called Ms. Delany's office to report that her cousin had been killed the night before and to request "some type of medication to help." (Tr. 980.) She had taken diazepam. (*Id.*)

When Ms. Treadway met with Ms. Schroeder on October 30, 2023, she reported that she had found an old diazepam prescription and taken two doses. (Tr. 1616.) She said she had stopped taking venlafaxine a few days prior because she had felt "shaky." (*Id.*) She said she was unable to afford Deplin nutritional treatment. (*Id.*) She reported that she had called a counseling service to set up counseling and was awaiting a call back. (*Id.*) She described increased anxiety, daily panic attacks, a racing mind, and sleep difficulty, among other things. (*Id.*) Ms. Schroeder indicated a diagnosis of "Bipolar 2 disorder (HCC)/PTSD (post-traumatic stress disorder)/GAD (generalized anxiety disorder." (Tr. 1619.) Ms. Schroeder prescribed cariprazine. (*Id.*)

Ms. Treadway met with Ms. Delany in a telehealth appointment for a refill of albuterol on November 7, 2023. (Tr. 983.) She returned to Ms. Delany on November 9, 2023, for sinusitis and was prescribed an antibiotic. (Tr. 990.)

Ms. Treadway had a telehealth appointment with Ms. Schroeder on November 28, 2023. (Tr. 1594.) She reported that she had been taking the cariprazine daily. (*Id.*) She reported that her father had unfortunately passed away, which had caused her to feel depressed and overwhelmed. (*Id.*) She described her anxiety as "still pretty bad" and described mood swings. (*Id.*) Ms. Treadway again requested a diazepam prescription, but Ms. Schroeder instead increased the dosage of cariprazine. (Tr. 1597.) Ms. Treadway was again "urged" to get self-scheduled for psychotherapy.

21

(*Id.*) As Ms. Treadway reported that she had left several messages without success for scheduling, Ms. Schroeder said she would make available a list of other counseling services. (*Id.*)

Ms. Treadway reported to the emergency department on December 14, 2023, complaining of generalized headache, dizziness, and lightheadedness. (Tr. 1265.) She said she had been on lorazepam for years for anxiety, but the prescription was recently discontinued. (*Id.*) A physical examination was normal, but hypertension and low oxygen saturation were documented. (Tr. 1268–72.) X-ray imaging of the chest showed no acute processes; CT imaging of the head was essentially normal. (Tr. 1270.) After further workup, Ms. Treadway was discharged with instructions to continue taking her hypertension medication. (Tr. 1272.) She expressed "excessive anxiety" at the recent death of her father and due to "withdrawal from her recent Ativan," so the hospital treated her with lorazepam at the hospital and discharged her with a 10-day prescription until she could be seen by a primary care provider. (*Id.*)

Ms. Treadway met with Ms. Schroeder on January 4, 2024. (Tr. 1571.) She reported that she had not taken any cariprazine at all, saying that she was scared to take it. (*Id.*) She reported that she had been prescribed lorazepam at the hospital and said that she was having frequent panic attacks and bad anxiety, with a continued labile mood and difficulty sleeping. (*Id.*) Ms. Treadway denied headache, joint pain, muscle aches, abdominal issues, and other symptoms. (Tr. 1573–74.) Ms. Treadway said she was agreeable to try cariprazine "as she has never even tried it as previously stated." (Tr. 1575.) She was given the name of a male counselor and encouraged to schedule with him. (*Id.*)

Two days later, Ms. Treadway was in the emergency room, concerned that she may have frostbite of the toes and complaining that she had been coughing and wheezing. (Tr. 1395.) She said she had pain in the toes and right upper leg. (*Id.*) There was "some wheezing" noted on

physical examination, but the exam was otherwise normal. (Tr. 1401–02.) She was discharged with steroids and an antibiotic. (Tr. 1403.)

Ms. Treadway returned to the ER on January 11, 2024, complaining of abdominal pain. (Tr. 1311.) Her physical examination was normal but for mild tenderness on palpation of the periumbilical area. (Tr. 1314–15.) She was diagnosed with enteritis and diagnosed with an anticholinergic and a proton pump inhibitor. (Tr. 1317.)

Ms. Treadway told Ms. Schroeder on January 31, 2024, that she was taking cariprazine inconsistently, having taken fewer than half the doses prescribed since her January 4 appointment. (Tr. 1548.) She was having "sporadic" panic attacks, mainly at night, but her mood had been "decent." (*Id.*) She said she grew annoyed and irritated easily. (*Id.*) She had been less anhedonic but was stressed about finances about a pet lizard had passed away. (Tr. 1549.) She had forgotten to call the counselor to set up an appointment. (*Id.*) On examination, Ms. Treadway's mood was euthymic, and her other indicators were all normal but for a circumstantial flow of thought. (Tr. 1551–52.) Ms. Schroeder emphasized the importance of medication compliance. (Tr. 1552.)

Ms. Treadway met with Ms. Schroeder again on April 8, 2024. (Tr. 1523.) She said that she had not taken the cariprazine in two weeks because she had been told that she cannot take it with her medical marijuana. (*Id.*) She said she recently became a member of the American Legion, where her son volunteers. (*Id.*) Her anxiety had been "ok" with less frequent panic attacks, and her mood has been "ok" but fluctuates. (*Id.*) She did say that her motivation was affected by "pain in whole body." (Tr. 1524.)

Ms. Schroeder decreased the frequency of cariprazine from once a day to once every other day, as Ms. Treadway was using medical marijuana regularly. (Tr. 1527.)

23

Ms. Treadway met with Ms. Delany by telehealth on April 24, 2024, complaining of a cough and likely respiratory infection. (Tr. 991.) Ms. Delany wrote, "[COPD] with acute lower respiratory infection" as her assessment. (Tr. 994.)

Ms. Treadway presented to the emergency department on May 5, 2024, complaining of cough, shortness of breath, and chest congestion for the past week. (Tr. 1363.) On examination, no nasal congestion or runny nose was noted. (Tr. 1371.) Wheezing was present on pulmonary examination, but without stridor, rhonchi, or rales. (Tr. 1372.) Her pulmonary effort was normal. (*Id.*) On x-ray, no acute processes were found. (Tr. 1377.) She was discharged after receiving a bronchodilator and corticosteroid treatment in the hospital. (*Id.*)

Ms. Treadway consulted with Ms. Schroeder on May 31, 2024. (Tr. 1494.) Ms. Treadway reported good compliance with the every-other-day cariprazine. (*Id.*) She said her mood had been "ok"; there had been no recent panic attacks. (*Id.*) While her mind raced at times, her focus and concentration were "adequate." (*Id.*) She had been engaging in social activities, having joined the American Legion. (*Id.*) She had a friend that she speaks to at the Legion. (*Id.*) She was dating someone and recently went to a concert with him, and she enjoyed that. (*Id.*) Her daughter had given birth the previous week. (*Id.*) Her mental status examination was normal, with a liner and goal-directed flow of thought. (Tr. 1497.) Ms. Schroeder noted that Ms. Treadway's mood was stable, and she continued Ms. Treadway on the same medication schedule. (Tr. 1498.) Ms. Schroeder indicated that someone from her office would call the referred counselor directly to facilitate scheduling. (*Id.*)

## IV.     THE ALJ'S DECISION

The ALJ found that Ms. Treadway had not engaged in substantial gainful activity since the application date of November 18, 2021. (Tr. 19.)

The ALJ next determined that Ms. Treadway had the following severe impairments:

(1) "depression/bipolar disorder," (2) anxiety; (3) post-traumatic stress disorder; and (4) a learning disorder. (*Id.*)

The ALJ further found that Ms. Treadway had a number of non-severe impairments: (1) heart murmur; (2) hypertension; (3) headaches; (4) thoracic scoliosis; (5) mild lumbar degenerative disc disease; (6) minimal degenerative disc disease of the cervical spine; (7) fairly frequent viral or bacterial infections; (8) psoriasis; (9) a number of rheumatological conditions (greater trochanteric bursitis both hips, Achilles' tendinitis, biceps' tendinitis, arthritis of both hands and feet, peroneal tendinitis, pes anserinus bursitis, posterior tibial tendinitis, subacromial bursitis and rotator cuff tendinitis bilateral shoulders, and bilateral carpal tunnel syndrome); and (10) nondurational cellulitis from insect bites. (Tr. 20–21.) The ALJ stated that the ALJ considered all of Ms. Treadway's impairments, including those found non-severe, when developing the residual functional capacity. (*Id.*) But the ALJ declined to find medically determinable impairments of fibromyalgia, a primary headache disorder, chronic obstructive pulmonary disease (COPD), asthma, arthritis in the hands or feet, or an opioid use disorder. (Tr. 21–23.)

The ALJ determined that none of Ms. Treadway's impairments, whether considered singly or in combination, met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. (Tr. 23.)

The ALJ determined that Ms. Treadway had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels but with certain non-exertional limitations. (Tr. 24.) Specifically, Ms. Treadway cannot climb ladders, ropes, or scaffolds. (*Id.*) She cannot work around hazards like unprotected heights or in proximity to exposed moving mechanical parts. (*Id.*) She cannot engage in occupational driving. (*Id.*) She can perform simple tasks without a production rate pace (such as assembly line work) or strict production quotas. (*Id.*) She can interact

25

occasionally with others and can deal with occasional changes in a routine work setting. (*Id.*)

The ALJ found that Ms. Treadway had no past relevant work. (Tr. 34.) The ALJ determined that Ms. Treadway was 37 years old on the date of her application and had a limited education. (Tr. 35.) But the ALJ concluded that—considering Ms. Treadway's age, education, work experience, and RFC—she could perform the work of a "hand packager" (DOT 920.587-018), "kitchen helper" (DOT 318.687-010), or "automobile detailer" (DOT 915.687-034). (*Id.*) Accordingly, the ALJ determined that Ms. Treadway is not disabled. (Tr. 36.)

## V.   LAW & ANALYSIS

### A.   Standard of Review

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at \*2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 Fed. Appx. 315, 320 (6th Cir. 2015) (quoting *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011)); *see also* 42 U.S.C. § 405(g).

"Under the substantial evidence standard, a court looks to an existing administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (cleaned up) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The standard for "substantial evidence" is "not high." *Id*. While it requires "more than a mere scintilla," "[i]t means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*. (quoting *Consolidated Edison*, 305 U.S. at 229).

26

In addition to considering whether substantial evidence supports the Commissioner's decision, the Court must determine whether the Commissioner applied proper legal standards. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.*, *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, . . . a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater*, 78 F.3d 305, 307 (7th Cir. 1996)) (alteration in original).

### B. <u>Standard for Disability</u>

Consideration of disability claims follows a five-step review process. 20 C.F.R. § 416.920. First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 416.920(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 416.920(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) (quoting 20 C.F.R. §§ 404.1520(c) and 416.920(c)).

Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P,

Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. § 416.920(d).

Before considering Step Four, the ALJ must determine the claimant's residual functional capacity, *i.e.*, the claimant's ability to do physical and mental work activities on a sustained basis despite limitations from her impairments. 20 C.F.R. § 416.920(e). An RFC "is the most [a claimant] can still do despite [the claimant's] limitations." 20 C.F.R. § 416.945(a)(1). Agency regulations direct the ALJ to consider the functional limitations and restrictions resulting from a claimant's medically determinable impairment or combination of impairments, including the impact of any related symptoms on the claimant's ability to do sustained work-related activities. *See* Social Security Ruling ("SSR") 96-8p, 1996 WL 374184 at *5 (July 2, 1996).

"A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner." *Golden v. Berryhill*, No. 1:18CV00636, 2018 WL 7079506, at *17 (N.D. Ohio Dec. 12, 2018), *report and recommendation adopted sub nom*, 2019 WL 415250 (N.D. Ohio Feb. 1, 2019). The ALJ is "charged with the responsibility of determining the RFC based on [the ALJ's] evaluation of the medical and non-medical evidence." *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). "[T]he ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support [the ALJ's] decision, especially when that evidence, if accepted, would change [the ALJ's] analysis." *Golden*, 2018 WL 7079506 at *17.

At the fourth step, if the claimant's impairment or combination of impairments does not prevent her from doing her past relevant work, the claimant is not disabled. 20 C.F.R. §§ 416.920(e)–(f). For the fifth and final step, even if the claimant's impairment does prevent her

28

from doing her past relevant work, the claimant is not disabled if other work exists in the national economy that the claimant can perform. 20 C.F.R. § 416.920(g). *See Abbott*, 905 F.2d at 923.

**C.      Analysis**

I address Ms. Treadway's assignments of error in reverse order, considering her Step Two arguments first before proceeding to her arguments directed at the ALJ's RFC determination and Step Five conclusions.

### 1.      *Second Assignment of Error – Fibromyalgia and COPD*

In her second assignment of error, Ms. Treadway argues that the ALJ erred at Step Two when she failed to find fibromyalgia or COPD to be medically determinable impairments. Ms. Treadway points out that the previous ALJ had, on nearly the same record, found both to be severe impairments. (*See* Tr. 115.) Yet after the Appeals Council's remand, the new ALJ found that they were not medically determinable impairments at all. Ms. Treadway asserts that the ALJ's conclusions in this regard were not supported by substantial evidence.

The Commissioner defends the ALJ's decision, arguing: (1) that any error at Step Two is harmless because the ALJ found other impairments to be severe and continued on with the sequential evaluation process; and (2) that the ALJ's conclusions were supported by substantial evidence.

At Step Two, an ALJ must determine whether a claimant's medically determinable impairment is a "severe" impairment. *See* 20 C.F.R. § 404.1520(a)(4)(ii). A "severe" impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities[.]" 20 C.F.R. § 404.1520(c). "Step two has been described as a 'de minimus hurdle'; that is, 'an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 243 n.2 (6th Cir. 2007) (quoting *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988)).

29

But when an ALJ finds severe and non-severe impairments at Step Two and continues through the subsequent steps in the sequential evaluation—as was the case here—any error at Step Two is normally harmless. *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987); *see also Floyd v. Comm'r of Soc. Sec.*, No. 23-2036, 2024 WL 3103757, at *2 (6th Cir. June 24, 2024).

However, courts within and outside of this circuit have distinguished between an ALJ's finding that a medically determinable impairment is non-severe and a finding that an alleged condition is not a medically determinable impairment in the first place. Generally, courts have found that an ALJ's failure to find that a condition is medically determinable is not harmless error unless the record reflects that the ALJ nevertheless considered the impairment in developing the RFC. *See Durbin v. Comm'r of Soc. Sec.*, No. 2:17-cv-896, 2020 WL 2744100, at *13–14 (S.D. Ohio May 27, 2020); *Kelley v. Comm'r of Soc. Sec.*, No. 1:24-cv-506, 2025 WL 1903777, at *3 n.1 (W.D. Mich. July 10, 2025) (collecting cases); *see also Bruce v. Comm'r of Soc. Sec.*, 2022 WL 1555402, at *6 (N.D. Ohio May 17, 2022).

Here, at Step Two, the ALJ concluded that fibromyalgia was not a medically determinable impairment pursuant to SSR 12-2p; the ALJ reasoned as follows:

> According to SSR 12-2p, fibromyalgia cannot be established as medically determinable without a diagnosis from an acceptable medical source based on signs and findings that are consistent with one of two sets of criteria and if the "diagnosis is not inconsistent with other evidence in the person's case record" (SSR 12-2p). This ruling states that we cannot rely on the diagnosis alone. Here we have one rheumatology visit purporting to show 18/18 tender points. While there were quite a few noted tender areas, the exam did not identify tenderness in the areas identified as relevant according to the 1990 ACR criteria for the classification of fibromyalgia. At least 11 positive tender points must be found at specific tender points sites. The 18 tender point sites are located on each side of the body at the: occiput (base of the skull); low cervical spine (back and side of the neck); trapezius muscle (shoulder); supraspinatus muscle (near the shoulder blade); second rib (top of the rib cage near the sternum or breastbone); lateral epicondyle (outer

30

aspect of the elbow); gluteal (top of the buttock); greater trochanter (below the hip); and inner aspect of the knee. To find 11 positive tender points on physical exam, the patient cannot be missing more than 7 tender point sites (or 3.5 sites bilaterally). On Dr. Stainbrook's exam, he does not find any tenderness at the occiput, ribs, lateral epicondyles, or gluteal muscles. Moreover, his exam does not make it clear whether the tenderness in the spine is in the paraspinal muscles or the axial spine. In any event, even assuming that the other areas of tenderness related specifically to the ACR Criteria (e.g., that "shoulder tenderness" is at the supraspinatus muscle, or "knee tenderness" is in the inner aspect of the knee), this exam is missing at least 8 of the required tender points sites and does not meet the first set of criteria.

Considering the 2010 ACR Criteria to establish fibromyalgia as a medically determinable impairment, the record does not support a finding that she has six or more repeated manifestations of fibromyalgia. She does have depression and anxiety. On rare occasions she complains of fatigue, but this is not a repeated manifestation. To the contrary, she is overwhelmingly awake and alert when seen by providers. She does not consistently report problems with memory or "fibro fog." She rarely has headaches, dizziness, and chest pain or tightness, but those symptoms appear related to, at times, poorly controlled hypertension and are therefore attributable to other causes. She has reported irritable bowel syndrome and has abdominal pain at times, but no etiology has been established for her abdominal pain except for enteritis seen on one occasion on computed tomography, and no acceptable source has diagnosed her with irritable bowel syndrome. She has had wheezing, but this is invariably in connection with a viral or bacterial upper or lower respiratory infection. No treating source has clearly identified 6 or more repeated manifestations that were not clearly attributable to other causes. In fact, most of her symptoms, other than pain, are quite clearly attributable to other causes, as noted above. For these reasons, fibromyalgia is not a medically determinable impairment under SSR 12-2p.

(Tr. 21–22) (internal citations to the record omitted).

Ms. Treadway devotes much of her argument to this aspect of the ALJ's opinion, arguing also that the ALJ's conclusions with respect to the state consulting opinions are erroneous for the same reasons—namely that the ALJ failed to correctly apply the 1990 and 2010 ACR criteria to the record evidence.

31

The Commissioner, however, argues that an error here is harmless because the ALJ proceeded through the sequential evaluation and considered any limitations stemming from Ms. Treadway's physical conditions when developing the RFC.

After careful consideration, and noting that the ALJ could have more clearly set forth her analysis on this issue, I conclude that—reading the decision as a whole—the ALJ adequately considered whether to include limitations attributable to alleged fibromyalgia when developing the RFC. I further conclude that the ALJ's decision not to include any such limitations to be supported by substantial evidence.

When crafting the RFC, the ALJ discussed Ms. Treadway's physical conditions as follows:

> As noted above, I have found her alleged physical conditions either not medically determinable or non-severe. The evidence of record is not consistent with her alleged physical symptoms. The objective evidence is mostly inconsistent with the extent of her subjective complaints. As noted above, she had one rheumatology visit showing a lot of tender points (though not necessarily in the areas required to meet the criteria for fibromyalgia) but at most of her other visits, no widespread tenderness was noted. Her imaging showed mild or no issues. Her physical examinations are mostly unremarkable. She was seen a couple of times in pain management in the fall of 2021, before the application date, and her exams were normal except for having moderate difficulty transitioning from sitting to standing, an antalgic gait, flexed posture, pain with some range of motion, minimal tenderness and some pain with lumbar facet loading. In contrast she was awake, alert, pleasant, cooperative and a good historian with intact sensation, full strength, and completely normal mental presentation. She declined most medications, indicating that she was "allergic" to Gabapentin and Cymbalta and that the only medications that could help her were Norco and Valium. She refused injections of any kind. As noted above, she did not follow up with the noted referral to occupational therapy or physical therapy. It was determined that she was not a good candidate for opioids and that benzodiazepines were not indicated. She later reported that she did not like pain management.
>
> . . .
>
> Nurse Schroeder was very insistent on the claimant's establishing with a counselor as part of her treatment, but the claimant failed to do so despite repeated reminders and great assistance in finding a counselor for her. The

claimant also failed to take her prescribed medications as ordered. With regard to the treatment notes of Nurse Delaney, the vast majority of both her "review of systems" (listing her reported symptoms) and her physical examination findings were normal, from January 2022 through May 2024, except for acute complaints mostly related to upper respiratory infections, ear infections, and COVID symptoms. The claimant was also seen often for medication refills. Ms. Delaney's typical examination, when the claimant was seen in person (for telephone visits Ms. Delaney indicated only vital signs), noted the claimant was in no apparent distress, with normal reflexes, sensation, strength, skin, mood, affect, insight and judgment, among other findings. . . . Between primary care visits she was seen somewhat frequently in the emergency department for mostly viral/infectious symptoms, but also insect bites, worries about carbon monoxide poisoning, accidental ingestion of scented oil, and some symptoms related to high blood pressure. She was seen at a physical medicine and rehabilitation practice in early 2023, and her exam was normal except for some elevated patellar reflexes, pain with heel and toe walk, and pain inhibited ankle range of motion. In the middle of 2023, the claimant established with a psychiatric nurse practitioner to prescribe medications and her physical exams through May 2024 were entirely normal with this provider.

The claimant's course of treatment is not consistent with her alleged pain complaints. As noted, she refused many treatment modalities, reported that she was allergic to medication or that other treatment would not help, or simply refused the treatment or evaluation recommendations. She sought controlled substances by name, even after multiple providers indicated that they were inappropriate. She reported inconsistent stories about her Ativan prescription, indicating in January 2023 she had not picked up her prescription, but then reporting that she was unable to get a refill due to her primary care provider being so busy. She later indicated that her prescriber took her off the drug in January after her drug screen was negative (inconsistent). She sought Ativan in the emergency department when she was anxious about an insect bite and anxious about elevated blood pressure. She did not typically report side effects to medications but reported not taking prescribed medications because she believed herself to be allergic or for no documented reason. She did not consistently report aggravating and precipitating factors. We have very little information about her daily activities, other than caring for her son, performing ordinary household tasks, having to clean her father's home after he passed away, attending appointments, going to the emergency department, and making candles.

Considering the record as a whole, I find that her reported pain and other physical symptoms are not consistent with the evidence, and that a preponderance of the evidence, including all the factors set forth in SSR 16-3p, support a finding that the claimant has no severe physical impairment.

33

(Tr. 25–26 (internal citations to the record omitted)).

Beyond arguing that the ALJ should have found fibromyalgia to be medically determinable, Ms. Treadway argues that the ALJ should have included limitations related to that condition based on SSR 12-2p, based on the state agency opinions recommending some physical limitations, and based on certain examination findings showing moderate difficulty transitioning from sitting to standing, an antalgic gait, lower extremity deficits, and mild disc thinning. (ECF No. 8, PageID# 1796–97.)

Because fibromyalgia presents without objectively alarming signs, cases involving fibromyalgia "place[] a premium on the analysis of subjective symptoms and, for purposes of judicial review, on the ALJ's articulation of the reasons supporting this analysis." *Jones v. Comm'r of Soc. Sec.*, No. 1:21-CV-01309-SO, 2022 WL 3567412, at *10 (N.D. Ohio July 20, 2022), *report and recommendation adopted*, 2022 WL 3566791 (N.D. Ohio Aug. 18, 2022). As the Sixth Circuit has held, "where subjective pain complaints play an important role in the diagnosis and treatment of the condition, providing justification for discounting a claimant's statements is particularly important." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007).

While Ms. Treadway points to a number of medical records, those records do not convince me that the ALJ's conclusions are not supported by substantial evidence. "[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003). A reviewing court may not "try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quoting *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984)); *see also Anderson v.*

34

*Comm'r of Soc. Sec.*, No. 1:21-CV-1471, 2022 WL 4545188, at \*2 (N.D. Ohio Sept. 29, 2022) ("it is also well-established that as long as the ALJ cites substantial, legitimate evidence to support the conclusion reached, the reviewing court may not second-guess that decision").

Most of the records Ms. Treadway points to are from 2021 and do reflect pain complaints and some abnormal findings on examination. (Tr. 483, 489, 501.) Ms. Treadway points also to her March 2022 mental status examination, wherein she complains of widespread pain, but I note that she also reported being able to do most household tasks, perform self-care activities, and spend time with others. (Tr. 682.) She complained of diffuse body aches in April 2022. (Tr. 783.) She complained of hip and back pain in November 2022 and April 2023. (Tr. 946, 1475.) She complained of toe pain in January 2024, but this was related to cold exposure and resolved. (Tr. 1395.)

The ALJ acknowledged these records, including the records from 2021 showing antalgic gait, difficulty transitioning from sitting to standing, postural abnormalities, and lumbar spine disc thinning. (Tr. 20–23, 25–34.) But the ALJ went on to explain how the longitudinal record did not support applying physical limitations from any physical condition. A review of the ALJ's reasoning shows why that conclusion is supported by substantial evidence and complies with SSR 12-2p.

SSR 12-2p sets out a roadmap for the ALJ in evaluating a claimant's fibromyalgia. 2012 WL 3104869, at \*6 (July 25, 2012). Among other things, the ALJ must evaluate the claimant's subjective complaints pursuant to the two-step process set forth in SSR 96-7p. First, the ALJ must determine whether the claimant has a medically determinable impairment that can reasonably be expected to produce the claimant's alleged symptoms. *Id.* Second, the ALJ must evaluate the intensity and persistence of the claimant's pain and other symptoms to determine the extent to which they limit the claimant's ability to work. *Id.* SSR 12-2p also provides that, given the distinct

characteristics of fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'" *Id.* at *6.

While the ALJ did not find fibromyalgia to be a medically determinable impairment, the ALJ *also* explained why the record does not support that the intensity and persistence of her pain and other symptoms limit her ability to work.

First, the ALJ repeatedly notes that Ms. Treadway's subjective pain complaints are not repeated frequently throughout this extensive record. Despite the sheer number of interactions Ms. Treadway had with treating professionals over the course of these several years, the ALJ accurately notes that the tenderness and decreased range of motion found at Dr. Stainbrook's August 2021 examination "were not elsewhere or consistently repeated." (Tr. 20–21; *see also* Tr. 25 ("at most of her other visits, no widespread tenderness was noted"). The ALJ acknowledged that Ms. Treadway complained of pain with Ms. Delany in late 2021, "early in the record," but that most of the following reviews of symptoms from January 2022 through May 2024 were normal apart from acute complaints like upper respiratory infections, ear infections, and COVID. (Tr. 26.) In other words, Ms. Treadway sought a lot of treatment over the years but did not frequently or consistently complain of widespread pain or fatigue.

In particular, the ALJ noted that, during Ms. Treadway's frequent visits to the hospital, she complained primarily of anxiety, hypertension, or viral or infectious symptoms, except for one-off visits for insect bites, ingestion of essential oil, and worries about carbon monoxide exposure. (*Id.*) The ALJ further noted that Ms. Treadway did not consistently report aggravating or precipitating factors for her conditions. (*Id.*) The ALJ found that there was no documented long history of widespread pain here. (*See* Tr. 27.)

36

The ALJ considered other reported physical symptoms as well. The ALJ acknowledged that Ms. Treadway has depression and anxiety and has at times complained of fatigue. (*Id.*) She notes that Ms. Treadway's headaches are most often associated (by both her and her treating professionals) to hypertension and anxiety, and they resolve quickly with treatment. (Tr. 20.)

The ALJ then considered Ms. Treadway's treatment history, finding it to be inconsistent with Ms. Treadway's statements about disabling fibromyalgia. The ALJ notes that Ms. Treadway has declined occupational therapy and physical therapy when recommended. (Tr. 21.) She has declined injection treatment. (Tr. 25.) The ALJ notes that the objective medical findings of "fibro tender points" are found in "one rheumatology visit" (in other words, the findings are not repeated consistently throughout the medical record). (*Id.*) Ms. Treadway repeatedly declined any treatment except for her preferred treatment of Norco and Valium, often seeming to "shop" around for a provider who would write her preferred prescription; she said inconsistent things to her providers about the medication she was taking (or not taking) and sought Ativan from the hospital when her primary care providers would not give it to her. (*Id.*) She failed to establish with a counselor, as repeatedly urged. (Tr. 26.) Her symptoms and activities of daily living improved markedly once she began taking the cariprazine as prescribed.

I do not find it unreasonable for the ALJ to have concluded that this treatment history is "not consistent with [Ms. Treadway's] alleged pain complaints" or the state consultants' finding of fibromyalgia as a severe condition. (*Id.*)

The ALJ also considered Ms. Treadway's activities of daily living, noting that Ms. Treadway shops for groceries, handles all household tasks, cares for a young son, has a relationship with a boyfriend, goes to the American Legion, has gone to a concert, and otherwise engages in activity inconsistent with disabling fibromyalgia symptoms. (Tr. 23–24.) The ALJ noted that Ms.

Treadway cleaned her father's home after he passed away, attends appointments, and makes candles. (Tr. 26.)

It is clear, reading the opinion as a whole, that the ALJ did not overly rely on objective examination findings but rather fulfilled her obligation to consider all the evidence, in compliance with SSR 12-2p, and she drew a reasonable conclusion (or at least one supported by substantial evidence) that Ms. Treadway's statements about the limiting effects of her pain and other fibromyalgia symptoms are not severe and are consistent with the RFC.

For similar reasons, I am not convinced that the ALJ failed to adequately consider the state agency consultants' opinions. The ALJ discussed supportability—noting that the opinion was based only on the one rheumatological visit and failed to support, with other evidence, a finding of widespread pain. (Tr. 27.) And the ALJ discussed consistency, noting that the opinion was "inconsistent with the evidence overall" and referencing the detailed analysis described above. (*Id.*)

Because the ALJ discussed the supportability and consistency of the opinions, and because her conclusions are supported by substantial evidence as discussed above, I am convinced that the Court should not disturb the ALJ's decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

For similar reasons, I am also convinced that the ALJ adequately considered Ms. Treadway's breathing symptoms in developing the RFC, such that any error at Step Two in failing to find COPD to be medically determinable would not be reversible.

At Step Two, the ALJ found that COPD was not a medically determinable impairment, reasoning as follows:

> While a diagnosis of chronic obstructive pulmonary disease appears in the record, this is primarily based on her self-reported history. We have no

objective signs/findings of obstructive pathology, as we have no pulmonary function tests, and her chest x-rays are normal outside of viral/bacterial infectious processes. Notably, her chest imaging shows no chronic abnormalities. Sources appear to presume this is a diagnosis based on her reported history and/or her ongoing smoking. Likewise, asthma is noted as a diagnosis but, again, she only has wheezing, rhonchi, and other abnormal findings when seen with a viral or bacterial infection, though at times this is diagnosed as a "COPD exacerbation," her symptoms are acute and reported to have arisen only a short time before she presents for treatment. Such symptoms resolve with the treatment of the underlying infection and/or symptoms. Even if I found that the record supported a medically determinable impairment of COPD or asthma, they would be non-severe for the same reasons (the lack of chronic symptoms that would limit function).

(Tr. 22) (internal citations to the record omitted).

As discussed above, the ALJ then further discussed her findings with respect to physical impairments when developing the RFC. She acknowledged those places where Ms. Treadway complained of congestion, cough, wheezing, lightheadedness, and other breathing difficulties and thoroughly reviewed the medical record. She explained, with citation to the record, that there was no specific pulmonary function testing showing obstructive pathology. (Tr. 22.) The ALJ noted that when Ms. Treadway complained of breathing difficulties at the hospital, imaging showed no acute processes and examination findings were often normal or mild. (*Id.*) Moreover, the ALJ accurately noted that Ms. Treadway's seeking treatment for wheezing and coughing were overwhelmingly associated with viral or bacterial infection and that symptoms went away quickly with treatment. (*Id.*)

The records that Ms. Treadway cites are not inconsistent with the ALJ's findings, with one possible exception. The ALJ stated that imaging showed "no chronic abnormalities." (Tr. 22.) Ms. Treadway accurately notes that a January 2023 x-ray showed *suspected* background reactive airways, and her treatment history suggests that her lungs may benefit from treatment from bronchodilators and steroids. (*See, e.g.,* Tr. 1074). To the extent the ALJ wrote that chronic

abnormalities had been completely excluded by imaging, that would not be accurate. I find the remainder of the ALJ's description of the evidence to be materially accurate and supported by substantial evidence in the record.

I further note that here, as opposed to above with respect to fibromyalgia, the ALJ's conclusions are also supported by the state agency consultants, who opined that Ms. Treadway had no severe physical impairments beyond fibromyalgia. (Tr. 88, 100.) Ms. Treadway, for her part, points to no medical opinion establishing a specific functional limitation stemming from Ms. Treadway's pulmonary condition.

Because the ALJ considered whether Ms. Treadway's pulmonary condition results in occupational limitations when developing the RFC, and because her conclusion that no such limitation should be included is supported by substantial evidence, I conclude that there is no reversible error in the ALJ's finding that COPD is not a medically determinable impairment at Step Two.

### 2. *First Assignment of Error – Mental Functioning*

In her first assignment of error, Ms. Treadway argues that the ALJ's findings with respect to her mental functioning are not supported by substantial evidence.

First, Ms. Treadway takes issue with the ALJ's statements throughout the decision about her treatment history and allergies. The ALJ noted that Ms. Treadway declined medications, suggesting that her claimed allergies were somehow doubtful. (*See, e.g.*, Tr. 25.) Ms. Treadway says this was a "presumption" that is not supported by evidence in the record. Ms. Treadway next calls inaccurate the ALJ's statement that Ms. Treadway's testimony that her pain management doctor "told her to smoke marijuana in lieu of other treatment" was "not supported by the record." (Tr. 26.)

I find neither argument persuasive. The ALJ's recitation of the medical evidence was materially accurate. A careful review of the medical records confirms that Ms. Treadway repeatedly sought Norco, Valium, or Ativan to the exclusion of other recommended medications and treatments. She declined medications, and also physical and occupational therapy, several times. She went to different providers seeking diazepam or lorazepam, often at close to the same times, and she obtained lorazepam from the hospital when her providers would not prescribe it to her.

The ALJ's statement about marijuana is also materially accurate. After being asked why she had not followed up with other treatment modalities to address her alleged disabling pain, Ms. Treadway testified that her pain management doctor "just put me on medical marijuana" and "[t]hat's all he did . . . ." (Tr. 52.) The ALJ correctly pointed out that this is not accurate. Dr. Swain said she might benefit from medical marijuana instead of opioids, but he also recommended physical therapy. (Tr. 506.) Other pain management professionals recommended that she follow up and try medical marijuana, but only after she refused to consider injections or other non-opioid or non-benzodiazepine treatment options. (*See* Tr. 498.) Ms. Schroeder urged Ms. Treadway to try cariprazine, but had to reduce the frequency of the dosage because Ms. Treadway was using medical marijuana frequently. (Tr. 1527.) Ms. Treadway's condition ultimately improved when she began taking the medication consistently. (Tr. 1494, 1498.)

The ALJ's point—that Ms. Treadway's condition was affected to some extent by her noncompliance with recommendations—is materially accurate and a reasonable one to make in light of this record.

41

Ms. Treadway next argues that the ALJ unfairly held it against her that she was not able to schedule with a psychotherapy counselor. She suggests that her inability to do so was due to her mental impairments or learning disorder.

Again, I find no reversible error. The ALJ acknowledged that Ms. Treadway said she had called seeking counseling and did not receive a return call. (Tr. 28.) But the ALJ notes that Ms. Treadway offered the same explanation for multiple referrals and after multiple and extensive efforts from Ms. Schroeder to connect her with counseling services. (*Id.*) The ALJ noted throughout the opinion that Ms. Treadway was able to seek medical services frequently and was almost always noted to be a good historian. In light of the record, I again find that the ALJ's reasoning here is supported by substantial evidence notwithstanding the records to which Ms. Treadway directs the Court. (*See* Tr. 1616–17, 1626–27, 1524, 1549, 1571, 1594, 1653, 1681.). She was able to navigate medical appointments with relative ease despite the documented issues with her motivation, sleep, concentration, and focus.

Ms. Treadway next contends that the ALJ failed to appropriately evaluate the opinions of Dr. Arnold, Ms. Delany, and the state agency psychological consultants.

The SSA considers opinions from medical sources under five factors: (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors, such as familiarity with other evidence in the claim or with the disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(c).

Section 404.1520c(b)(1) specifically provides that "it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [the ALJ] considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record." 20 C.F.R. § 404.1520c(b)(1).

42

Of the five factors, supportability and consistency are the most important, and an ALJ must explain how the ALJ considered them. 20 C.F.R. § 404.1520c(b)(2). The ALJ "may" but "is not required to" explain how the ALJ considered the remaining factors. *Id.*

The "supportability" factor looks to how well the medical source supports the opinion with objective medical evidence from the record. See 20 C.F.R. § 404.1520c(c)(1). "In other words, the supportability analysis focuses on the physicians' explanations of the opinions." *Lavenia v. Comm'r of Soc. Sec.*, No. 3:21cv674, 2022 WL 2114661, at *2 (N.D. Ohio June 13, 2022) (quoting *Coston v. Comm'r of Soc. Sec.*, No. 20-12060, 2022 WL 989471, at *3 (E.D. Mich. Mar. 31, 2022)).

The "consistency" factor looks to how consistent the medical opinion is with evidence from other medical and nonmedical sources. See 20 C.F.R. § 404.1520c(c)(2). "As long as the ALJ discussed the supportability and consistency of the opinion and supported [the ALJ's] conclusions with substantial evidence within his decision, the Court will not disturb [the ALJ's] decision." *Njegovan v. Comm'r of Soc. Sec.*, No. 5:21-CV-00002-CEH, 2022 WL 1521910, at *4 (N.D. Ohio May 13, 2022).

With respect to supportability, Ms. Treadway says that the ALJ improperly discounted these opinions for relying heavily on Ms. Treadway's subjective statements of her functioning.

Before turning to each opinion, I note that Ms. Treadway's argument leaves out an important foundational aspect of the ALJ's opinion. As discussed further above, and throughout this section of the decision, the ALJ considered each of the SSR 16-3p factors and determined that Ms. Treadway's subjective statements about the intensity and persistence of her symptoms were not fully consistent with the record evidence. The ALJ repeatedly referred to Ms. Treadway's: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate symptoms; (4) the type, dosage, effectiveness, and side

43

effects of any medication; (5) treatment an individual receives or has received other than medication; (6) any measures other than treatment an individual uses or has used; and (7) any other factors concerning the claimant's functional limitations and restrictions. 2016 WL 1119029 at *7–8, (Mar. 16, 2016).

I make this observation because, in addition to what I discuss below, the ALJ clearly explained that the ALJ considered that the supportability of opinions relying heavily on Ms. Treadway's subjective statements turns in large part on how credible those statements are. Having found them less than credible, the ALJ found opinions relying solely or heavily on them to be less supportable. Ms. Treadway directs the Court to no authority holding that this reasoning does not comport with the regulations.

Moreover, "[i]t is for the administrative law judge, not the reviewing court, to judge the consistency of a claimant's statements." *Lipanye v. Comm'r of Soc. Sec.*, 802 F. App'x 165, 171 (6th Cir. 2020). And while "those determinations must be reasonable and supported by substantial evidence," the ALJ's determinations are reasonable here for the reasons described above and below. *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 249 (6th Cir. 2007); *see also Kurman v. Comm'r of Soc. Sec.*, No. 1:20-cv-01837, 2022 WL 765072, at *3 (N.D. Ohio Mar. 14, 2022) ("The ALJ's decision . . . must be rooted in the record and must contain specific reasons for the weight given to the [claimant's] symptoms.") (quotations omitted).

Ms. Treadway points out that the ALJ found Dr. Arnold's opinion regarding social interaction and adaptation was less than persuasive because "he simply repeated her subjective reports but voiced no opinions." (Tr. 32.) And she points out that the ALJ wrote that Dr. Arnold's statements related to certain domains "are not medical opinions because they simply restate her

44

subjective allegations rather than offering a medical opinion as to function based on evidence." (Tr. 33.)

Ms. Treadway's argument, and the caselaw she gathers in support, do not address the ALJ's actual finding. The ALJ did not reject Dr. Arnold's opinion as to social interaction for a lack of supportability; the ALJ found that Dr. Arnold did not express an opinion as to any functional limitation on that issue in the first place. Indeed, reading Dr. Arnold's report, it is difficult to discern what his opinion is—if any—as to Ms. Treadway's ability to adapt or maintain social interactions. He writes, in his "functional assessment," that:

> The claimant has limited social interactions, mostly with family. The claimant reported difficulty with social interactions in the past, always feeling uncomfortable around others and preferring to be alone, a history of sometimes interacting well with co-workers and supervisors and responding inadequately to workplace pressures by getting upset, feeling overwhelmed and quitting. The claimant has adapted to limitations by remaining at home, self-isolating and adjusting activities. The reported plan for the future is "I don't have a plan for the future, just plan to raise my children and follow whatever path g-d takes me on".

(Tr. 683.)

It is difficult to find reversible error in the ALJ's characterization of this statement as merely a summary. Dr. Arnold wrote earlier that "[t]he claimant does spend time with other people, specifically family and can tolerate these interactions for up to an hour or more." (Tr. 682.) But that is not readily understood as a concrete opinion on Ms. Treadway's ability to adapt or interact socially.

Ms. Treadway next points to the ALJ's statements about the state psychological consultants:

> The findings of the DDS that the claimant is moderately limited in domains 2–4 and mildly limited in domain one, with associated residual functional capacity limits, is persuasive in part. While the DDS supported this in part by reference to evidence available to them at the time of their findings, their

45

> narrative relies heavily on the claimant's subjectively reported symptoms rather than objective evidence, course of treatment, and other evidence such as daily activities. As the claimant's subjective reports are in themselves inconsistent with the record, as discussed above, they provide only partial support for the DDS' findings.

(Tr. 33.)

The ALJ further found that, "the DDS' support for precluding public work is poor, as they relied principally on her subjective reports, which in themselves are not consistent with the evidence, as discussed above." (*Id.*)

I find no reversible error in these findings. As an initial matter, the ALJ ultimately found a moderate limitation in the area of understanding, remembering, and applying information—a greater limitation than the consultants recommended. (Tr. 33.) The ALJ then ultimately adopted the consultants' opined limitations. The only specific functional limitation that Ms. Treadway points out as being excluded is the limitation to "work in a non-public setting." (Tr. 93.) But, as discussed above, I do not find reversible error in the ALJ's find that opinion to be less credible where it was based principally on subjective statements that have been found inconsistent with the record.

Turning to Ms. Delany, the ALJ observed that her opinions were "very poorly supported." (Tr. 34.) Ms. Delany cited to the mental questionnaire she completed, which in turn "appear to be the subjective reports of the claimant (as nowhere in Ms. Delaney's records has she indicated that she observed either marked or extreme limitations in terms of any of aspect of mental functioning.)" An ALJ adequately addresses supportability by discussing how a provider's opinion is not supported by objective evidence contained in her own treatment notes. *See Rattliff v. Comm'r of Soc. Sec.*, No. 1:20-cv-01732, 2021 WL 7251036, at *9 (N.D. Ohio Oct. 29, 2021) (holding that ALJ addressed supportability factor by noting that physician's opinion was inconsistent with

46

physician's treating notes), *report and recommendation adopted*, 2022 WL 627055 (N.D. Ohio Mar. 3, 2022); *Neff v. Comm'r of Soc. Sec.*, No. 5:18 CV 2492, 2020 WL 999781, at *11 (N.D. Ohio Mar. 2, 2020); *see also Hopkins v. Comm'r of Soc. Sec.*, No. 23-5696, 2024 WL 3688302, at *3 (6th Cir. Apr. 9, 2024) (approving an ALJ's supportability explanation where, among other things, the ALJ found the opinion unsupported by the objective findings in her medical report).

Ms. Treadway acknowledges that Ms. Delany's notes were "not detailed," but she argues that Ms. Delany's "personal observations of Plaintiff provide support for her opinions." I find no reversible error in the ALJ's conclusion that Ms. Delany's extreme limitations find poor support in her treatment notes.

Ms. Treadway turns finally to the issue of consistency. Here, here argument is a straightforward "cherry-picking" argument. She points to evidence that she says support greater social interaction limitations. (*See, e.g.*, Tr. 86–91, 93, 101–03, 105–06, 1551, 1574, 1686.)

But after a careful review, I find that the ALJ thoroughly discussed the treatment notes from each provider and other medical records (including the numerous hospital records) and explained—with citations to those notes—that the notes are inconsistent with greater limitations than those contained in the RFC. It is clear that the ALJ carefully reviewed the record, including the notes reflecting Ms. Thompson's mental health complaints and associated mental status examinations, considered those notes as well those showing unremarkable examination findings inconsistent with disabling limitations, considered Ms. Thompson's activities of daily living (including attending American Legion events, dating, navigating numerous hospital and medical appointments, and attending a concert), and made reasonable conclusions supported by substantial evidence.

Before briefly concluding, I turn briefly to an argument raised primarily in the reply brief, namely that the ALJ erred by not using the word "superficial" when translating the agency consultants' opined limitations into the RFC. I find no reversible error here, either. First, Ms. Treadway did not significantly raise or brief this issue in her merits brief.

Additionally, to the extent the argument is not waived, an ALJ is not required to adopt the verbatim wording of an opined limitation in the RFC finding. *E.g.*, *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). The term "superficial interaction" is not defined in the governing regulations. *See, e.g., Lopez v. Comm'r of Soc. Sec.*, No. 1:22-CV-01801, 2024 WL 1580101, at *19 (N.D. Ohio Apr. 11, 2024) (collecting cases). There is general—although not universal—agreement that a limitation to "superficial interaction" is a limitation on the depth or quality of one's interactions, as opposed to the frequency of interactions. *See, e.g., Haahr v. Comm'r of Soc. Sec.*, No. 3:23 CV 2159, 2024 WL 5242214, at *3 (N.D. Ohio Dec. 30, 2024).

Here, the ALJ stated that her combination of limitations, including a limitation to simple work, adequately covers that opined limitation. (Tr. 33.) As discussed above, Ms. Treadway was limited to performing "simple tasks without a production rate pace (such as assembly line work) or strict production quotas" in a routine work environment with only "occasional changes" and where she needs to interact with others only occasionally.

This court in *Wieman* reasoned that a combination of restrictions (there, occasional interaction with supervisors; only simple, routine, and repetitive tasks; few changes in the work setting; and "infrequent[] and . . . easily explained" changes) can sufficiently encompass a superficial interaction limitation. *Wieman v. Comm'r of Soc. Sec.*, 2023 WL 5541597 at *3 (citing *Carver v. Colvin*, 600 F. App'x 616, 620 (10th Cir. 2015) (superficial interaction adequately accounted for, where the claimant was limited to simple instructions and interacting with

coworkers and supervisors "under routine supervision," because "[i]nteracting with supervisors in the course of routine supervision over simple work is tantamount to the 'superficial' interaction typically encountered in jobs involving such work.").

Here, I find that the combination of restrictions identified by the ALJ adequately accounted for the opinions of the state agency consultants and any discrepancy between the RFC and other medical opinions was adequately explained and supported by substantial evidence.

In conclusion, I am confident that the ALJ complied with the regulations in evaluating these opinions, and that her conclusions are supported by substantial evidence. Accordingly, I recommend that the Court overrule Ms. Treadway's first two assignments of error.

## VI.    RECOMMENDATION

Based on the foregoing, I RECOMMEND that the Court AFFIRM the Commissioner's final decision.

Dated:  June 10, 2026

/s/ *Jennifer Dowdell Armstrong*
Jennifer Dowdell Armstrong
U.S. Magistrate Judge

## VII.    NOTICE TO PARTIES REGARDING OBJECTIONS

Local Rule 72.3(b) of this Court provides:

> **Any party may object to a Magistrate Judge's proposed findings, recommendations or report made pursuant to Fed. R. Civ. P. 72(b) within fourteen (14) days after being served with a copy thereof, and failure to file timely objections within the fourteen (14) day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure**. Such party shall file with the Clerk of Court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections. **Any party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.** The District Judge to whom the case was assigned shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which

49

objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the Magistrate Judge. The District Judge need conduct a new hearing only in such District Judge's discretion or where required by law, and may consider the record developed before the Magistrate Judge, making a determination on the basis of the record. The District Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.

*Id.* (emphasis added).

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; a general objection has the same effect as would a failure to object. *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).

Stated differently, objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, at *2 (W.D. Ky. June 15, 2018) (quoting *Howard*). The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878–79 (6th Cir. 2019).

50